IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY ANNE GULIK, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security,[1] ) <br> ) <br> Defendant. ) | No. 16 C 5815 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[2]

On October 17, 2012, Mary Anne Gulik filed for disability benefits, claiming an onset date of December 18, 2011 (R. 151), later amended to December 15, 2010 (R. 160).[3] After her application was denied initially and on reconsideration, Ms. Gulik received a hearing before an Administrative Law Judge ("ALJ"). On December 17, 2014, the ALJ issued a written decision denying her request for benefits. The Appeals Counsel denied Ms. Gulik's request for review, making the ALJ's opinion the final decision of the Commissioner (R. 1). Presently before this Court is Ms. Gulik's motion to reverse and remand the ALJ's decision (doc. # 14). The motion is now fully briefed. For the reasons that follow, we grant Ms. Gulik's motion to remand.

I.

Ms. Gulik has complained to physicians of pain in her upper (cervical) back or neck, lower (lumbar) back radiating down her right leg and right knee since late 2010, when she was

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2]On July 15, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 8).

[3]A later agency document states that the onset date was changed to December 18, 2010 (R. 162). However, the parties and the ALJ each use the December 15, 2010 date. We use the parties' agreed date as the three-day difference does not affect this opinion.

38 years old (R. 260-65). MRIs at that time showed only minimal degenerative changes (*Id.*), but her pain continued. On February 4, 2011, Ms. Gulik had one visit with a rheumatologist, Richard M. Keating, M.D. (R. 431). Dr. Keating's report stated that the physical examination showed "numerous myofascial tender points with minimal palpation," and he opined that Ms. Gulik had fibromyalgia syndrome (R. 430-31).[4]

On February 28, 2011, Ms. Gulik began treatment for her pain with Faris Abusharif, M.D., of Pain Treatment Centers of Illinois; she described her lower back pain as radiating down her right lower extremity, particularly in her hip (R. 270-71). In March and April 2011, Dr. Abusharif administered lumbar, cervical and hip epidural injections to treat Ms. Gulik's pain, and prescribed her medications including Lyrica (nerve pain medication), Flexeril (muscle relaxant), and Norco (narcotic) (R. 272, 275). This treatment provided little lasting relief, and in June 2011, Dr. Abusharif administered another lumbar injection and increased Ms. Gulik's prescription for Norco, discontinued the prescription for Lyrica, and added a prescription for Neurontin (nerve pain medication and anti-convulsant) (R. 277-79). In July and August 2011, Dr. Abusharif administered another cervical injection and an injection into Ms. Gulik's right knee (R. 281, 285). In October 2011, Neurontin was discontinued due to side effects, and Ms. Gulik was prescribed amitriptyline (an anti-depressant used to treat fibromyalgia pain) (R. 287).

During a visit to Dr. Abusharif in December 2011, Ms. Gulik reported that her lower back and right lower extremity pain had escalated to a constant, stabbing level of 9 out of 10 and was exacerbated by sitting, standing or walking (R. 288). Dr. Abusharif administered a right sacroiliac joint steroid injection and added a prescription for Savella (nerve pain medication and antidepressant) (R. 289). His report of that visit also stated that Ms. Gulik consulted with a surgeon, Dr. Tony Rinella, who felt surgery was not a "necessary option" and recommended that

---

[4] The copy in the record of this medical report is of very poor quality, but these findings are legible.

Ms. Gulik continue with non-surgical treatment for her pain (R. 288). That month, Ms. Gulik stopped working as a certified nursing assistant because the pain in her legs made her unable to lift patients (R. 195).

Telephone records from the Pain Treatment Centers indicate that Ms. Gulik's pain did not abate in the first half of 2012. A record of a February 2012 call indicated that Ms. Gulik's pain was so severe -- despite taking Norco -- that she did not want to wait four days for her steroid injection (R. 496). And, in April 2012, Ms. Gulik asked for and received a refill of Flexeril (*Id.*).

In July and August 2012, Ms. Gulik had additional imaging of her lumbar spine, which showed early degenerative disc disease, annular tears and some disc protrusion (R. 297-98, 300). On August 21, 2012, Dr. Abusharif performed a lumbar discogram -- an invasive test to evaluate the cause of back pain -- because despite repeated epidural injections, Ms. Gulik's pain recurred (R. 301).[5] Dr. Abusharif determined that at L4-L5, there was a broad-based posterior disc protrusion abutting L5 nerve roots and bilateral foraminal extensions of the disc abutting L4 nerve roots, as well as a grade IV radial tear in the posterior aspect of the disc (R. 305). The next month, September 2012, Ms. Gulik reported continuing sharp pain in her low back radiating down her right lower extremity, and her pain medication was listed as Savella, Percocet (narcotic) and Lyrica (R. 306), with a refill of Flexeril approved in December 2012 (R. 495).

On January 3, 2013, Ms. Gulik reported a partial decrease of pain symptoms in the cervical region after an injection, but she had severe low back pain radiating down the right leg causing periods of weakness, tingling and numbness in her lower extremities (R. 381). Dr. Abusharif prescribed Medrol (anti-inflammatory), and changed Ms. Gulik's narcotic prescription from Percocet to OxyContin (R. 381-83). On January 9, 2013, Ms. Gulik consulted with Daniel

---

[5] A discogram is an "invasive test that generally isn't used for an initial evaluation of back pain," but may be performed if a patients back pain persists despite extensive nonsurgical treatment. http://www.mayoclinic.org/tests-procedures/discogram/basics/why-its-done/prc-20013848).

3

Troy, M.D., at the Midwest Bone Joint Spine Institute on a referral from Dr. Abusharif to see if there was "anything further that [he] could possibly do to entertain and relieve her symptoms," which had not resolved with injections (R. 294). Dr. Troy recommended that Ms. Gulik continue with non-surgical treatment options at that time (R. 294-95).

In January 2013, Ms. Gulik also reported increasing pain over her right saroiliac ("SI") joint (joint between lower spine and pelvis), lateral hip and anterior thigh (R. 332). On January 15, 2013, Benjamin Domb, M.D., of Hinsdale Orthopaedics, ordered an MRI, which showed a tear in the right hip labral (cartilage) (R. 330). On January 24, 2013, Ms. Gulik complained to Dr. Domb of worsening SI joint pain and right hip pain and associated radiculopathy from her lumbar spine; examination showed decreased range of motion, pain, and tenderness (R. 328-29). Dr. Domb gave her a lidocaine injection in the hip and recommended physical therapy for "a last trial of non-operative treatment" (R. 330-31). The next day, Dr. Abusharif administered a right sacroiliac joint injection for her low back, right buttock and right leg pain (R. 386). On February 22, 2013, Ms. Gulik reported that although she had some pain relief since her injection, she still had severe pain in her low back radiating down her right lower (R. 387).

On March 13, 2013, a non-examining state agency physician opined based on the medical record that Ms. Gulik could perform sedentary work -- lift up to ten pounds occasionally, stand or walk for a total of two hours, and sit for a total of about six hours in an eight-hour workday (R. 80-82). This opinion was affirmed on reconsideration on September 27, 2013, after consideration of additional evidence submitted by Ms. Gulik (R. 85-91).

On April 8, 2013, Dr. Abusharif administered another lumbar epidural steroid injection, and Ms. Gulik continued to take OxyContin, Flexeril, Savella and Lyrica for her pain (R. 391). The next day, Ms. Gulik returned to Dr. Domb, reporting no relief in her hip, low back and SI

4

joint pain (R. 366-68). Dr. Domb determined that because Ms. Gulik "failed to improve with conservative measures of physical therapy, activity modification and treatment of her SI joint and back," she was a candidate for right hip arthroscopy to repair her labral tear (R. 368). Dr. Domb performed the right hip arthroscopy on April 17, 2013 (R. 326-27). After the surgery, Ms. Gulik had physical therapy through July 2013 to help decrease pain and improve her range of motion (R. 335, 357). She also exercised, including riding her bike two hours per day (R. 335). On July 25, 2013, Dr. Domb reported that Ms. Gulik's hip was 80 percent improved from the surgery but that she still experienced weakness and occasional soreness with prolonged standing and decreased range of motion in her hip (R. 362).

Ms. Gulik continued to visit the Pain Treatment Center. On July 18, 2013, Dr. Abusharif administered a right SI joint injection and bilateral neck trigger point injections, and Ms. Gulik continued to take Flexeril, Lyrica, OxyContin and Savella (R. 392). On August 15, 2013, Ms. Gulik reported 80 percent pain reduction since the injection, but described continued pain her lower back with radiation into the right buttock and hip (R. 393). On October 3, 2013, Dr. Abusharif administered a cervical epidural steroid injection for Ms. Gulik's neck pain, which radiated down her arms (R. 490), but on November 4, 2013, Ms. Gulik reported that she had no reduction in pain after that injection (R. 488). Later that month, Dr. Abusharif administered a lumbar epidural steroid injection (R. 504). However, Ms. Gulik reported that her pain relief from that injection lasted only one week, and in December 2013 and January 2014, she continued to have severe pain in her lower back and hips, radiating down her legs (R. 481, 484).

On November 14, 2013, James T. Niemeyer, D.O., reported that Ms. Gulik had an adverse reaction to the October 2013 cervical injection; after the injection, she had trouble

5

breathing (R. 451).[6] Ms. Gulik also reported that her neck pain and headaches were getting worse, as was her thoracic (mid-back) pain (*Id.*). Dr. Niemeyer reported that examination revealed "chronic tissue texture changes in the cervical paraspinal," and he performed osteopathic manipulation to ease her pain (R. 452). Ms. Gulik also continued to take muscle relaxants and pain killers (*Id.*).

On February 4, 2014, Dr. Niemeyer filled out a Physical Residual Function Capacity ("RFC") Questionnaire (R. 414-16). Dr. Niemeyer indicated that Ms. Gulik experienced daily pain in her neck, hip, lower back, and arm, and that this pain would constantly interfere with the attention and concentration she needed to perform even simple tasks (R. 414). Further, Dr. Niemeyer opined that Ms. Gulik could sit or stand for only 15 minutes at a time, and less than two hours total in a work day, and that she would be likely to be absent three days of work per month as a result of her impairments (R. 414-16).

On March 25, 2014, Dr. Abusharif administered a sacroiliac injection (R. 480), but this provided a reduction in pain symptoms for only two weeks (R. 478). Dr. Abusharif continued to prescribe pain medication as well as topical ointments to help with tender paraspinous muscles (R. 478-79). In addition, in June 2014, he administered a lumbar epidural steroid injection for a "significant flare up of low back pain" radiating downward (R. 477), and in August 2014, he administered a sacroiliac joint injection to treat Ms. Gulik's pain, numbness and weakness in her right lower extremity (R. 474-75). On August 1, 2014, Ms. Gulik also returned to Dr. Niemeyer, who performed a chiropractic adjustment to alleviate her neck and upper back pain (R. 461-63). Dr. Niemeyer also prescribed Norco, Baclofen (muscle relaxant) and Prednisone (steroid) (*Id.*).

---

[6] Ms. Gulik saw Dr. Niemeyer for her general medical needs as well as for chiropractic adjustments; the earliest report from Dr. Niemeyer in the record is from January 2013, but their treatment relationship evidently began earlier, as that report was a follow up to earlier appointments (R. 312-14).

6

In August 2014, Ms. Gulik revisited Hinsdale Orthopaedics, complaining of worsening neck pain extending to left side and limited cervical range of motion (R. 527). In October 2014, Ms. Gulik visited Hinsdale Orthopedics and described her hip pain as feeling "like it did prior to surgery" (R. 525). Examination showed that her hip was painful to the touch (*Id.*).

## II.

On October 16, 2014, Ms. Gulik testified at her administrative hearing that she only has one or two good days a week (R. 54, 61). On a good day, she could walk for an hour or two and shop for groceries with her husband, but never by herself (R. 48, 54, 61-62); on a "really good day," she would pick something to do around the house, like balancing the checkbook (R. 57). However, on a typical day, she would wake up and sit in a lounge chair until her medications - which included OxyContin, Lyrica, Flexeril, steroids and muscle relaxers -- kicked in (R. 51, 56). She then went downstairs to make her children's lunches and get them out the door, after which she would lie on the couch (*Id.*). On a typical day, Ms. Gulik's pain lasted from a couple hours to all day; she rated her pain at seven out of 10, but it was getting worse (R. 60-61). Her pain affected her ability to sleep, so she took naps during day (R. 64-65). When her neck pain was bad, she got migraines; Excedrin helped but her nausea remained the rest of the day (R. 65-66). Ms. Gulik also started taking Xanax in 2014 because she was having panic reactions from her shots (R. 52). She drove occasionally but not often due to the side effects from her medications (R. 49, 55). They made her forgetful and confused; for example, Ms. Gulik testified that she "got an overdraft" because she had forgotten she had let her kids use her checkbook (R. 55, 57). Surgery was not an option because of the 40 percent chance that it would make her problems worse (R. 55-56).

7

At the hearing, Ms. Gulik's husband assisted her to walk out of the room during a fire drill, and she stood two or three times during the hearing (R. 53, 67). Ms. Gulik testified that she could stand about 20 to 30 minutes, and sit in an office chair about 20 minutes before she needed to stand and stretch for a few minutes (R. 61, 66). That day, she sat in her car for the 30 minute drive to the hearing (R. 54).

The vocational expert ("VE") testified next. The ALJ asked the VE to consider an individual "limited to sedentary work, except they would need to alternate between sitting and standing, such that after every twenty minutes of sitting, they would have to stand for five minutes, sort of reorient themselves and then sit back down at will" (R. 69-70). The VE stated that three jobs would be available for that individual -- document preparer, charge account clerk, or weight tester -- but any time standing would have to be on task, because employers require employees to be on task for 85 percent of the day or more, which would not allow for stretching or walking during the five minute intervals (R. 70-73). Although the Dictionary of Occupational Titles does not indicate a sit/stand option for those jobs, based on her 20 years of experience as a vocational counselor, the VE stated that her testimony about that option was consistent with the requirements of those positions (R. 71).

### III.

On December 17, 2014, the ALJ issued a written opinion finding that Ms. Gulik was not disabled from December 15, 2010, her alleged onset date, through September 30, 2014, her date last insured (R. 16). At Step 1, the ALJ found that she had not engaged in substantial gainful activity during this time (R. 17). At Step 2, the ALJ found that Ms. Gulik had the severe impairments of degenerative disc disease, labral tear of the right hip, and obesity (*Id.*). The ALJ stated that her impairments of degenerative disease of the right knee, fibromyalgia and asthma

8

were not severe (*Id.*). Regarding fibromyalgia, the ALJ found that the medical records did not include the required evidence of at least 11 tender points on physical examination (R. 19). At Step 3, the ALJ determined that these impairments, alone or in combination, did not meet or medically equal the severity of a listed impairment (*Id.*).

The ALJ then stated that Ms. Gulik had an RFC to perform sedentary work, except that she required an option to "sit and stand at will, with 20 minutes of sitting and five minutes of standing before sitting again" (R. 19-20). In making this finding, the ALJ reviewed Ms. Gulik's testimony that her pain interferes with her ability to sit, stand and sleep most nights, that she had difficulty "completing tasks, concentrating, using her hands and with her memory" due to pain in her back, legs, neck, and hip, and that her medication causes side effects like confusion and forgetfulness (R. 20). However, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 21) because they were "inconsistent with previous reports of greater activity" such as swimming and riding her bike (R. 24). In addition, the ALJ stated that the RFC determination was consistent with Ms. Gulik's testimony that after sitting for 20 minutes, she needed three to five minutes to stand and stretch (*Id.*).

The ALJ reviewed the medical records from January 2011 through August 2013, and acknowledged that they document that Ms. Gulik received ongoing treatment for pain in her neck, lower back, SI joint and hip, including epidural steroid injections and pain medications such as Neurontin, Norco and amitriptyline (R. 21-22). However, the ALJ noted that "the physical examination findings generally show tenderness but full muscle strength and intact sensation," and that "the medical records show improvement in the claimant's pain level with treatment, including injections" (R. 21). In addition, the ALJ stated that after December 2011,

9

"the record does not contain evidence of significant medical treatment for her back and sacroiliac joint pain" (*Id.*). Although Ms. Gulik had surgery on her right hip in April 2013, the ALJ noted that by July 2013, Ms. Gulik was 80 percent improved from the surgery and had a normal gait (R. 23).

The ALJ gave "little weight" to the opinion of Dr. Niemeyer, stating that the portions of Dr. Niemeyer's opinion limiting Ms. Gulik to sedentary work were supported by medical evidence, but "more extreme portions of Dr. Niemeyer's opinion—namely, sitting less than two hours total in an eight-hour workday, needing to walk around every 30 minutes for 10 minutes, and being absent from work about three days per month—are not supported by the medical evidence" and were contradicted by Ms. Gulik's testimony that she spent most of the day sitting (R. 24-25). In addition, the ALJ stated that Dr. Niemeyer's opinion that Ms. Gulik needs to walk around for ten minutes every thirty minutes was inconsistent with Ms. Gulik's testimony that she could sit for twenty minutes before needing to stretch for three to five minutes (R. 25). The ALJ also gave only "some weight" to the opinions of the non-examining state agency medical consultants, because the ALJ stated that he "further limited the claimant" to sedentary work based on Ms. Gulik's testimony (R. 24).

At Step 4, the ALJ determined that Ms. Gulik could not perform her previous job as a certified nursing assistant (R. 25). However, at Step 5, the ALJ adopted the VE's testimony that Ms. Gulik could perform the jobs of document preparer, charge account clerk, and weight tester, and that she was therefore not disabled (R. 25-26).

## II.

We review the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). Ms. Gulik argues, among other things, that remand is necessary because the ALJ failed to adequately assess evidence of her pain. The Court agrees.

It is well-settled that "[a]n ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). Here, the ALJ stated that the medical records showed improvement in the level of Ms. Gulik's pain, and that after December 2011, there is no evidence that Ms. Gulik received significant medical treatment for her back and SI joint pain. These conclusions ignore abundant evidence in the record that Ms. Gulik's pain continued, even increased, during the relevant time period, as did her attempts to treat this pain with repeated epidural injections and prescription pain medication. Indeed, the ALJ's review of the medical evidence stopped in August 2013, more than a year before the hearing and Ms. Gulik's date last insured, despite evidence that Ms. Gulik's pain continued and she continued to seek out medical treatment for it during this time. Even Ms. Gulik's hip pain -- which the ALJ correctly stated had improved after surgery in 2013 -- returned in 2014.

The ALJ's conclusion also fails to adequately address the effectiveness of the injections Ms. Gulik received. It is axiomatic that the claimant's "pain level is a relevant consideration in determining the effectiveness of the treatment." *Moore*, 743 F.3d at 1127. However, the ALJ

11

concluded that Ms. Gulik's pain had improved during the relevant time period despite evidence that the injections provided only temporary relief, such as Ms. Gulik's frequent return to the pain clinic to receive additional treatment for recurring, severe pain.

Moreover, the ALJ's conclusion that Ms. Gulik's pain had improved to the point that she was able to work ignores the well-settled maxim that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). In this case, Ms. Gulik's testimony that she had bad days and good days aligned with the medical evidence, which showed that while she sometimes had improvement in her pain symptoms from various treatment, it consistently returned in force. Where a claimant "reported that some days he felt worse than others, [] the fact that [a physician] recorded that that he felt 'fine' at one appointment does not weaken the rest of his testimony about disabling pain." *Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015).

For these reasons, the ALJ did not adequately address the evidence of Ms. Gulik's pain, and therefore, his determination that she is not disabled was not supported by substantial evidence.

**B.**

Although the ALJ's failure to adequately discuss evidence of Ms. Gulik's pain is sufficient to warrant remand, we briefly address a particular aspect of the opinion which the ALJ should clarify on remand. In his opinion, the ALJ determined that Ms. Gulik's RFC was sedentary "except that she requires an option to sit and stand at will with 20 minutes of sitting and five minutes of standing before sitting again" (R. 19-20), and the ALJ stated that the VE testified that jobs existed in significant numbers for an individual with this RFC (R. 25). The

ALJ also stated that this RFC was consistent with Ms. Gulik's testimony at the hearing that she could "sit for 20 minutes and then must stand for three to five minutes to stretch" (R. 24). However, the VE testified that such jobs would *not* exist if an individual with the aforementioned RFC was not on task during this period of time, but instead had to stretch or walk (R. 70-73). On remand, the ALJ should clarify how the RFC, the VE's testimony and Ms. Gulik's testimony are consistent with each other.

## CONCLUSION

For the reasons stated above, we grant Ms. Gulik's motion to remand (doc. # 14). This case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

Sidney I. Schenkier
**United States Magistrate Judge**

**Dated: August 2, 2017**